SOUTH HAMPTON *v.* FOWLER.

Where land and the franchises of a town containing it were granted to the same persons by the same charter, this was held to vest no title to the land in the town as a municipal body.

A town acquires no title, by virtue of its act of incorporation, to land within its limits not before granted.

If the title to lands in Hampton not granted to individuals was in the town, and a new town was formed within its limits containing the land, the title still remained in Hampton; affirming the doctrine of *Union Baptist Soc.* v. *Candia,* 2 N. H. 20.

Votes of a town in possession of land, showing a claim of title, are admissible, as giving a character to its possession; but where there is no evidence of possession, they are inadmissible.

Records of a town which holds land as a private corporation, unless accompanied by possession, are not admissible, even against a stranger, to prove that the town claimed the title.

TRESPASS, by South Hampton against Richard Fowler, for breaking and entering the plaintiffs' close in Seabrook, bounded easterly by the Atlantic ocean, southerly by the State line of Massachusetts, westerly by the Blackwater river, and northerly by Hampton river. The plea is the general issue.

At the trial, to show title and possession in themselves, the plaintiffs offered the charter of the town of South Hampton, granted by Benning Wentworth, as governor of the province of New Hampshire, May 25, A. D. 1742, in the name of the king of Great Britain, &c. The charter recites that at the petition of sundry inhabitants of the land bordering on Massachusetts, &c., the governor, for divers good causes and considerations, with the advice of the council, has granted and confirmed to the said inhabitants and their successors, to be a town or parish incorporate by the name of South Hampton, bounded as follows: Beginning at the Atlantic ocean on the east, at a distance of three miles north of the mouth of the Merrimack river, and thence to run northerly to the bounds of that part of Hampton called Hampton Falls, thence westerly to the parishes of Kensington and Kingston,

&c. (the westerly boundaries being immaterial to this suit), including all the inhabitants and their estates, from said three miles north of the Merrimack river northerly from Mitchell's line to Hampton Falls, &c., excepting the lands, estates, and polls of Jacob French and certain other persons named in the charter, " who are hereby annexed to the parish of Hampton Falls ;" to have and to hold all of the privileges and immunities of a town corporate, and to be ruled and governed in all respects for the said town affairs by the laws of the province, " as other towns are." And the charter provides for an annual town-meeting, to choose officers and transact any other affairs of the town, as other towns and parishes, according to the laws of the province, do.

The plaintiffs also proved an order of the general court of Massachusetts bay, Oct. 23, A. D. 1657, settling the line between Hampton and Salisbury at the middle of Hampton river, and thence westerly by what is called Shapleigh's line to what is now the south-east corner of Kensington ; and reciting, as a historical fact, the establishment of the boundary line between Massachusetts and New Hampshire, according to Mitchell's survey in 1742. They showed an act of the provincial legislature of Dec. 4, A. D. 1742, to the effect that all the inhabitants of South Hampton and their estates, being east of what is now the westerly line of Seabrook, were declared to belong to Hampton Falls parish. Also, an act of the same legislature, June 3, 1768, erecting and incorporating a new parish in Hampton Falls, which fixed the dividing line between Hampton Falls and Seabrook as it now is, and declared that all the polls and estates in Hampton Falls, which lay southerly of said line, should be incorporated by the name of Seabrook. Also, an agreement made May 14, 1795, between the selectmen and committees of the towns of South Hampton and Seabrook, " to settle the line for the taxation of lands belonging to non-residents ;" which line, so agreed upon, extends the whole length of Seabrook, from west to east, leaving the *locus in quo,* and a large part of the present town of Seabrook, on the southern or South Hampton side of the line. Also, copies of a plan of Seabrook and a plan of South Hampton, filed in the office of the Secretary of State, under the act of Dec. 30, 1803, by both of which it appeared that the *locus in quo,* and the southern portion of what is now Seabrook, were included within the limits of South Hampton. On the plan of the latter town was written this memorandum : " South Hampton taxes all the non-resident lands below the double line [*i. e.,* what is now the west line of Seabrook] to the ocean—but the inhabitants belong to Seabrook." The plaintiffs read, also, the act of the legislature of June 26, 1822, by which it is declared that all east of what is now the westerly line of Seabrook shall belong to Seabrook for taxation, jurisdiction, and all other legal purposes ; " provided, however, that any part thereof, which is now the public property of the town of South Hampton, shall be exempt from taxation so long as the same shall belong to that corporation." The plaintiffs produced the ancient records of the town of South Hampton, and offered to read therefrom votes and acts of the town relating to

the lands in dispute, and particularly the following, and others similar to them : " March 5, 1764, voted, that the beach grass shall neither be cut nor fed the year ensuing. It wàs further voted, that there be a committee chosen to take care of the common or beach, in said town, and prosecute any person that shall be found trespassing upon the town coast. Capt. Ephraim Brown, Samuel Paige, and Joseph Whittier were chosen committees." " March 4, 1765, voted, that there shall be no pine trees cut upon our beach, nor grass mowed nor fed, except what is wanted to prevent the sea breaking over the banks." Also, entries like the following : " May 21, 1743, voted, that Eph. 'Brown [and others] have the use of the beach at the east end of the town for the year ensuing, for ten shillings." " May 18, 1767, it was put to vote to see whether the selectmen shall take care of the beach for the year ensuing, and let it out for mowing to the best advantage for the town use, and passed in the affirmative." And they offered to prove, in the same manner, votes and action of the town for many years, from 1742 down to the date of the writ; but the court excluded the evidence.

The plaintiffs then produced the selectmen's books of South Hampton, and offered to prove ancient entries by selectmen, now deceased, like the following : " Nov. 12, 1812, paid Moses Eaton for going to see Samuel Fowler and others respecting their cattle running at large on the beach, $1.00." " March 10, 1819, received of Jacob Fowler, for thatch which grew on the South Hampton common, $2.00." " 1829, cash received of Col. Merrill Flanders, for pool grass, $8.25." " 1827, paid Parker Merrill, for the expenses when the pastorage pool, &c., were rendered, $1.02." But the court excluded the evidence.

The court and jury viewed the premises, and it appeared that the land claimed by the town, including the *locus in quo*, contains some 600 or 700 acres, principally sand or beach hills, lying between the ocean and certain marsh lands, producing little but patches of coarse grass, with some small trees and bushes.

The plaintiffs suggested that they had evidence tending to show actual occupation of the soil, by cutting the grass, warning off trespassers, &c., but reserved it with a view to raise the questions arising upon the foregoing case ; whereupon the court directed a nonsuit to be entered, with the understanding that the nonsuit was to be set aside if the plaintiffs should elect to offer evidence after the opinion of the court should be had upon the case now stated.

Case reserved.

*Hatch*, for the plaintiffs.

*Frink, Butler*, and *Goodall*, for the defendant.

BELLOWS, C. J. It is contended by the plaintiffs' counsel, that, by the charter of incorporation granted in 1742, the unoccupied lands within its limits became the property of South Hampton.

It will be perceived that the royal governor did not undertake to make any grant of land, within the bounds described, to the town, or to any person, but simply to make the inhabitants of that territory and their successors a body corporate.

It is urged that the body corporate thus constituted at once acquired title to all the lands within its limits not before granted ; and to sustain this position the plaintiffs rely much upon the views expressed by Judge BELL, in *Willey* v. *Portsmouth*, 35 N. H. 310, and by Judge EASTMAN, in *Forsaith* v. *Clark*, 21 N. H. 416. The remarks of Judge BELL had relation to the rights and votes of the town of Portsmouth soon after it had come under the government of Massachusetts in 1641 ; and he said,—"It is matter of history that the towns of this province at that time claimed the fee of the lands within their limits, which were not granted to individuals. Some portion of the lands in Portsmouth was held under grants by Mason or his agents ; but the titles generally were not under Mason, but under grants of the town. It was nearly a century after this that the distinction began to be made between the town and the proprietary. The town exercised the rights of owner, and, whether well or ill founded, it was acquiesced in, and not disputed."

These remarks applied obviously to the origin of land titles at that early period, and in that part of the State which was included within the original limits of what was afterwards known as Dover, Portsmouth, Exeter, and Hampton. They never could have been intended to bear a construction that should give to a town the title to land which was granted to individuals. In *Forsaith* v. *Clark*, Judge EASTMAN suggests that, in the early grants of townships in this province and in Massachusetts, the grant of the land and the franchises of the town were made to the same persons by the same charter, and that the power of the grantees over the land was exercised by them in their character of a town corporation, and not as a proprietary distinct from the town ; and that the very early records of ancient towns show that the entire management of the business of the proprietary was conducted in the town meetings until after 1730.

It will be perceived that here is no suggestion that the title to such land was in the town as a municipal body, but that the proprietary, down to 1730, exercised its power over its lands through the town organizations. So long as the grantees of the land and the inhabitants of the towns were the same, it is quite reasonable to suppose that the distinction should not always have been preserved ; but for a very long time the distinction has been kept up, and the proprietary meetings have ever been largely held in towns other than those in which the lands lie.

We think, then, that in cases of this sort there can be no ground for a valid claim by the town to the land so granted to a proprietary, even although the same individuals are incorporated into a town by the same grant. Neither can we entertain the opinion that by the mere act of incorporation of individuals settled upon a particular territory,

the town acquires the title to the land not before granted. By such incorporation the inhabitants acquire the ordinary municipal rights and privileges of a town, but acquire no title to land, unless it be provided for in the grant. Such acts of incorporation are very numerous in this State, arising out of the divisions of towns; and it has never been supposed that the title to land is affected by such incorporation, unless special provision for it is made. If it were otherwise it would be fatal to the plaintiffs' case, as Seabrook was incorporated in 1768, and the lands in question are there.

We must, then, look beyond the mere charter of South Hampton, granted in 1742, for evidence of its title to the land in question; and with this view the plaintiffs' counsel urges that, by the common law of this State, the title to all the lands in the south-eastern part of the State was in the settlers collectively before they were incorporated as towns, and that the charters simply organized the proprietors of the common and unoccupied lands without vesting any new title. In respect to the towns once known as Cochecho or Northham, Strawberry Bank, Squamscott, and Winnicumett, and now known as Dover, Portsmouth, Exeter, and Hampton, it is unquestionable that they claimed and exercised the right of disposing of the lands within their respective limits, and the titles thus granted have been to a large extent acquiesced in or otherwise established.

It would seem, indeed, that until their union with Massachusetts in 1641, which was the result of their own voluntary act, these towns exercised separately, as little democracies, most of the powers of government, including the right of granting the lands within their limits. At an earlier period than 1641, the colony of Massachusetts, as shown by their provincial records, exercised jurisdiction over what was then called Winnicumett, now Hampton, and those records furnish some evidence that the settlement of that town was commenced under the authority of that colony in 1638; and by the same authority, in March, 1639, it was made a town with the usual town privileges, and the disposition of the lands within its limits was committed to the freemen thereof.

These acts of the Massachusetts colony were recorded in the first book of the records of Hampton, and the powers committed to the town were unquestionably exercised.

These four towns, which thus exercised the power of granting the lands within their limits, were much greater in extent than the present towns of those names, and, indeed, for some years comprised all the settlements in the province of New Hampshire, the territory beyond their limits being regarded as the great waste. These towns remained under the government of Massachusetts until 1679, when they were severed from it by the crown and made part of the province of New Hampshire.

The town of Winnicumett, soon changed to Hampton, embraced what is now North Hampton, South Hampton, Hampton Falls, Kensington, Seabrook, and perhaps other territory, all taken at different times from Hampton, which is now a small town.

If the title to the lands not granted to individuals was in the town of Hampton—as perhaps might be inferred from the fact that it had the power to grant the lands within its limits—then, according to the doctrine of *Union Baptist Society* v. *Candia*, 2 N. H. 20, the title still remained in Hampton, notwithstanding the lands, by a division of the town, may have fallen within the jurisdiction of a new town;—and such is the law in Massachusetts, *Windham* v. *Portland*, 4 Mass. 389 ; *Hampshire* v. *Franklin*, 16 Mass. 86.

The same doctrine is applied to lands held by a parish for the use and support of the ministry ; and the title in the old parish is not affected by the formation of a new one, even although the land fall into the new parish.  *Brunswick* v. *Dunning*, 7 Mass. 445 ;—and see *Newmarket* v. *Smart*, 45 N. H. 87, and cases cited.

If this doctrine is not to be recognized here, but the title is held to vest in the new town where the land happens to fall, then it would still be fatal to the plaintiffs' claim to recover, as the lands lie within the incorporated town of Seabrook, even if that town was formed out of South Hampton, as the case seems to assume, although the act of June 3, 1768, assumes to form the parish of Seabrook from the southerly part of Hampton Falls parish, which appears to have been incorporated in 1712.

However this may be, whether Seabrook was in whole or in part taken from South Hampton, as would be inferred from the boundaries given in the charter of the latter in 1742, it is wholly immaterial in this view of the case.

If the title to the lands within its limits did not vest in Hampton, there is obviously no ground for claiming that the lands in South Hampton vested in that town by virtue of any usage or State common law ; for it is only from the powers exercised by Hampton and the other three towns that the existence of any such right could be deduced.  Without a reference to the history of these ancient towns, no plausible ground could be found to uphold the plaintiffs' claim that the title to the ungranted land vested in the town within the limits of which it was situate.  Whether or not the title to such lands was vested in these ancient towns, we give no opinion ; but if it did, we think it does not show a title in South Hampton to lands in Seabrook, which was once part of Hampton.  We have thus referred to the existence of these ancient towns, and the fact that the towns of Seabrook and South Hampton were formed out of Hampton, upon the ground that these facts are shown by public statutes of which courts may judicially take notice.  *Winnipiseogee Lake Co.* v. *Young*, 40 N. H. 429.

If the town of South Hampton entered upon the lands in question claiming title, it could, like any private person, maintain a suit against a mere wrong-doer, and, upon proving such entry and possession, any votes of the town showing a claim of title would be admissible, as giving character to that possession—much the same as the payment of taxes on land by one in possession of it.  *Hodgdon* v. *Shannon*, 44 N. H. 576, and cases cited ; *Farrar* v. *Fessenden*, 39

N. H. 277. The payment of the taxes is admissible only to give a character to the possession, and without the possession it would not be admissible.

The evidence offered in this case by the plaintiffs, and rejected, went to show that the town, by its votes, claimed title to the land. Had this been accompanied by proof of possession, it would clearly have been admissible ; but no such proof was offered.

This raises the naked question whether proof of an assertion of title by the town is competent evidence against a stranger.

So far as respects the land in question, the town holds it, if at all, substantially as a private corporation, and not as a municipal corporation, created by the government for the purpose of executing public duties, exercising, in fact, a portion of the sovereignty of the State ; but it holds the land for its own benefit, and by virtue of some special law or usage which authorizes, but does not require, the town to hold it. This distinction is well defined in *Eastman* v. *Meredith*, 36 N. H. 296, where the cases are cited and examined. It is the doctrine, also, of *Oliver* v. *Worcester*, 102 Mass. 489.

The land, then, being held as by a private corporation, the records of the town are not admissible to prove that the town claimed the title, unless it was accompanied by possession ; for, although the records are competent to prove the acceptance of a charter, the organization of the corporation, the election of officers, and other corporate acts, yet in matters of a private nature they are not admissible in support of its own claims against a stranger, or even against a member who claims adversely and not under the corporation. So it is laid down in *Wheeler* v. *Walker*, 45 N. H. 358, and in several authorities there cited. Such is the doctrine of Angel & Ames on Corp. 605–7, and cases cited ; and so is *Haynes* v. *Brown*, 36 N. H. 567, and Jackson *ex-dem., Donally* v. *Walsh*, 3 Johns. 226.

Of course, if the corporate act of the town became material, as to show the appointment of an agent to make entry upon the land and the like, the record would be the proper evidence so to show a claim of title to give character to an entry ; but the difficulty here is, that the offer was to show a mere naked claim without any entry,—and that being the case, it was properly excluded. The testimony offered by the plaintiffs from the selectmen's books may have tended to prove possession in the town, and we think was competent, and had it been received, the testimony from the records offered by the plaintiffs would also have been competent ; but it does not appear in the case that the plaintiffs excepted to the exclusion of this evidence offered from the books of South Hampton. This, however, is of little importance, as the nonsuit is to be set aside if the plaintiffs so elect. If the plaintiffs had excepted to the exclusion of this testimony, the nonsuit would have been set aside. It is urged that the title of South Hampton is recognized by the act of June 26, 1822 ; but we are unable to see how a provision, that land in Seabrook owned by South Hampton shall be exempt from taxation so long as so owned, can be regarded as confirm-

ing any title upon South Hampton, where, as the case stands, the title to the land in question must be regarded as in Hampton or else in Seabrook,—if, indeed, it had ever passed from the original proprietor.

Unless, then, the plaintiffs elect a further trial, there must be

*Judgment on the nonsuit.*